**United States District Court**
**District of New Jersey**

_____

United States of America,

      Plaintiff,

      v.

Christopher Castelluzzo,

      Defendant.

_____

25 CR 501 (EP)

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT CHRISTOPHER CASTELLUZZO'S PRETRIAL MOTIONS TO DISMISS

Peter Katz, Esq.
Law Offices of Peter Katz. LLC
116 Village Blvd.. 2nd Floor
Princeton, NJ 08540
peter@pkatzlegal.com

Leslie M. Sammis, Esq.
Sammis Law Firm, P.A.
1005 N. Marion Street
Tampa, FL 33602
lsammis@sammislawfirm.com

*Attorneys for Christopher Castelluzzo*

Table of Contents

I.  INTRODUCTION ..............................................................................................1

II.  FACTUAL BACKGROUND ............................................................................5

III.  ARGUMENT ..................................................................................................16

A.  INDICTMENT INSUFFICIENTLY PLEADS CONSPIRACY UNDER 18 U.S.C. § 1956(H)............16

   1.  The Indictment Insufficiently Pleads the Transactional Money Laundering Theory under 18 U.S.C. § 1957 Since the Criminally Derived Proceeds were Initially Valued at Less than the $10,000 Statutory Threshold...............................................17

   2.  The Indictment Insufficiently Pleads the Transactional Money Laundering Theory under 18 U.S.C. § 1957 as a Matter of Statutory Interpretation Since Cryptocurrency Exchanges are Not a Financial Institution.....................................19

   3.  The Indictment Insufficiently Pleads the Concealment Money Laundering Theory under 18 U.S.C. § 1956(a)(1)(B)(i) Since it Fails to Allege Any Facts Showing a Design to Conceal or Disguise. ..............................................................21

B.  THE INDICTMENT FAILS TO ALLEGE A MONEY-LAUNDERING CONSPIRACY THAT CONTINUED INTO THE FIVE-YEAR STATUTE OF LIMITATIONS PERIOD. .............................24

C.  THE SOLE COUNT OF THE INDICTMENT IS DUPLICITOUS BECAUSE IT IMPERMISSIBLY MERGES TWO SEPARATE AGREEMENTS IN AN EFFORT TO AVOID THE STATUTE OF LIMITATIONS. .................................................................................29

D.  THE INDICTMENT MUST BE DISMISSED FOR OPPRESSIVE PRE-INDICTMENT DELAY IN VIOLATION OF DUE PROCESS. .............................................................31

E.  THE GOVERNMENT'S FALSE STATEMENTS CONCERNING THE SECOND EXTENSION CONSTITUTE PROSECUTORIAL MISCONDUCT THAT WARRANTS DISMISSAL UNDER THE FIFTH AMENDMENT. .................................................................35

F.  DISMISSAL IS APPROPRIATE BECAUSE THE INDICTMENT IS A RESULT OF A VINDICTIVE PROSECUTION. .................................................................................37

G.  DISMISSAL UNDER THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT IS REQUIRED BECAUSE THERE IS CLEAR EVIDENCE OF SELECTIVE ENFORCEMENT AND PROSECUTION..41

TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Ark. Tchr. Ret. Sys. v. State St. Corp.*, 25 F.4th 55 (1st Cir. 2022) .............................................. 36

*Blackledge v. Perry*, 417 U.S. 21 (1974) ...................................................................... 38

*Bordenkircher v. Hayes*, 434 U.S. 357 (1978) ................................................................ 38

*Six v. Generations Fed. Credit Union*, 891 F.3d 508 (4th Cir. 2018)………………………..…36

*Government of the Virgin Islands v. Fahie*, 419 F.3d 249 (3d Cir. 2005)............................. 36, 37

*Grunewald v. United States*, 353 U.S. 391 (1957) ........................................................ 24, 26–28

*In re $8,508.63 from PNC Bank Account x1775, Misc. Action No. 17-136*,

    2018 WL 3427635 (E.D. Pa. July 16, 2018) ................................................... 34

*In re Taylor*, 655 F.3d 274 (3d Cir. 2011)…………………………………………………....36

*King v. Whitmer*, 71 F.4th 511 (6th Cir. 2023) ............................................................... 36

*Landreth Timber Co. v. Landreth*, 471 U.S. 681 (1985) .................................................... 20

*Me. Audubon Soc'y v. Purslow*, 907 F.2d 265 (1st Cir. 1990) .......................................... 36

*Musacchio v. United States*, 577 U.S. 237 (2016) .......................................................... 24

*Regalado Cuellar v. United States*, 553 U.S. 550 (2008) ................................................ 22

*Russell v. United States*, 369 U.S. 749 (1962) ............................................................... 23

*Smith v. United States*, 568 U.S. 106 (2013) ................................................................. 24

*United States v. $80,891.25*, 2011 WL 6400420 (S.D. Ga. Dec. 19, 2011) ............................... 31

*United States v. 2014 Mercedes-Benz GL350BLT*,

    162 F. Supp. 3d 1205 (M.D. Ala. 2016) ..................................................... 32-33

*United States v. Andrews*, 633 F.2d 449 (6th Cir. 1980) ................................................... 39-40

*United States v. Batchelder*, 442 U.S. 114 (1979) ......................................................... 41

*United States v. Bergrin*, 650 F.3d 257 (3d Cir. 2011) ..................................................... 16

*United States v. Cafiero*, 292 F. Supp. 2d 242 (D. Mass. 2003) .................................................. 39

*United States v. Esposito*, 968 F.2d 300 (3d Cir. 1992) ................................................................ 38

*United States v. Esterman*, 324 F.3d 565 (7th Cir. 2003) ............................................................ 23

*United States v. Frederick Douglass*, 82 F.4th 1122 (D.C. Cir. 2023).................................... 41-43

*United States v. Garcia-Emanuel*, 14 F.3d 1469 (10th Cir. 1994) ............................................... 23

*United States v. Goodwin*, 457 U.S. 368 (1982) .......................................................................... 38

*United States v. Gotti*, 457 F. Supp. 2d 411 (S.D.N.Y. 2006) ..................................................... 22

*United States v. Greenidge*, 495 F.3d 85 (3d Cir. 2007) ............................................................. 17

*United States v. Haggerty*, 528 F. Supp. 1286 (D. Colo. 1981) ............................................. 41-42

*United States v. Hodge*, 211 F.3d 74 (3d Cir. 2000) ................................................................... 16

*United States v. Johnson*, 440 F.3d 1286 (11th Cir. 2006) ......................................................... 23

*United States v. Kelly*, 892 F.2d 255 (3d Cir. 1989) .................................................................... 29

*United States v. LaDeau*, 734 F.3d 561 (6th Cir. 2013) .......................................................... 39-40

*United States v. Lovasco*, 431 U.S. 783 (1977) ........................................................................... 31

*United States v. Marion*, 404 U.S. 307 (1971) ............................................................................ 31

*United States v. Motley*, 655 F.2d 186 (9th Cir. 1981) ............................................................ 39-40

*United States v. Mumphrey*, 193 F. Supp. 3d 1040 (N.D. Cal. 2016) ..................................... 42-43

*United States v. Ness*, 565 F.3d 73 (2d Cir. 2009) ...................................................................... 20

*United States v. Ojala*, 544 F.2d 940 (8th Cir. 1976)……………………………………………....43

*United States v. Omoruyi*, 260 F.3d 291 (3d Cir. 2001) .............................................................. 21

*United States v. Olvis*, 97 F.3d 739 (4th Cir. 1996) .................................................................... 42

*United States v. Paramo*, 998 F.2d 1212 (3d Cir. 1993) ............................................................. 38

*United States v. Pirro*, 212 F.3d 86 (2d Cir. 2000) ........................................................... 16, 23–24

*United States v. Richardson*, 658 F.3d 333 (3d Cir. 2011) .......................................................... 22

*United States v. Schoolcraft*, 879 F.2d 64 (3d Cir. 1989) ...................................................... 39, 41

*United States v. Sokolow*, 91 F.3d 396 (3d Cir. 1996) ................................................ 17

*United States v. Starks*, 515 F.2d 112 (3d Cir. 1975) ........................................... 29-30

*United States v. Torquato*, 602 F.2d 564 (3d Cir. 1979) ............................................ 42

*United States v. Vitillo*, 490 F.3d 314 (3d Cir. 2007) ............................................... 16

*United States v. Washington*, 869 F.3d 193 (3d Cir. 2017) .................................... 40-41

*United States v. Wright*, 651 F.3d 764 (7th Cir. 2011) ........................................ 18-19

*Wayte v. United States*, 470 U.S. 598 (1985) ........................................................ 41

*Wharton v. Superintendent Graterford SCI*, 95 F.4th 140 (3d Cir. 2024) ........................... 35–36

*Wilson v. U.S. Parole Comm'n*, 193 F.3d 195 (3d Cir. 1999) ..................................... 20

## Statutes

18 U.S.C. § 3282(a) ............................................................................ 24, 28

18 U.S.C. § 983(a)(3)(A)–(B) ........................................... 1-2, 5, 7-8, 11, 31-36

18 U.S.C. § 1956(a)(1)(B)(i) .................................................. 3, 15-16, 21

18 U.S.C. § 1956(h) ..................................................... 15-17, 19, 21-24

18 U.S.C. § 1957 ......................................................... 2, 15-20

21 U.S.C. § 881(a)(6) ...................................................................... 13

26 U.S.C. § 7206(1) ......................................................................... 23

## Rules & Other Authorities

Fed. R. Crim. P. 12(b)(1), (b)(3) ................................................................. 1

Fed. R. Crim. P. 41(g) .............................................................. 1, 4, 7, 31, 34

ABA, Criminal Justice Standards for the Prosecution Function

    § 3-1.4(b) (4th ed. 2017) ................................................................. 35–36

DOJ Justice Manual § 9-112.120 ....................................................... 7, 31

## I.    INTRODUCTION

Defendant Christopher Castelluzzo ("Mr. Castelluzzo"), through undersigned counsel,

submits this Memorandum of Law in support of his Motion to Dismiss the Indictment pursuant

to Federal Rules of Criminal Procedure 12(b)(1) and 12(b)(3), the Fifth and Sixth Amendments

to the United States Constitution, applicable statutes, and governing principles of common law.

In separate motions, Mr. Castelluzzo also seeks suppression of evidence, recusal of certain

members of the U.S. Attorney's Office, a bill of particulars, and various other relief.

The Government made this criminal accusation in a last-ditch attempt to forfeit Mr.

Castelluzzo's 30,000 Ethereum (ETH). As alleged in the Indictment, in 2014, Mr. Castelluzzo

purchased the 30,000 ETH in an Initial Coin Offering (ICO) using $9,000 worth of Bitcoin

(BTC). The Government made no efforts to seize the 30,000 ETH until years later when it

appreciated by several orders of magnitude—rising in value from its purchase price of

approximately $9,000 in BTC to values that have fluctuated above $140 million.

After the FBI seized the 30,000 ETH in July 2022, Mr. Castelluzzo filed a Rule 41(g)

motion for return of property in Colorado that included a verified claim signed by Mr.

Castelluzzo. During that litigation, the government expressly admitted that Mr. Castelluzzo's

motion and claim filed in Colorado triggered a March 22, 2022 deadline under 18 U.S.C. §

983(a)(3)(A) to commence judicial forfeiture proceedings—an admission that bound the

government in subsequent proceedings. The government sought extensions of that deadline in

Misc. Case Number 2:23-mc-00083-ES in New Jersey. Although three Assistant United States

Attorneys (AUSAs) appear to have prepared a proposed order and motion for a second

extension, the order was never signed, and the motion was never filed with the clerk or entered

on the docket. Having missed the statutory deadline, 18 U.S.C. § 983(a)(3)(B) required the

1

government to release the property. Instead, the AUSAs decided to file pleadings in Colorado that *falsely* claimed the second extension had been granted. By doing so, the AUSAs successfully prevented the statutorily required order directing the release of the property in the District of Colorado. Meanwhile in New Jersey, AUSAs delayed the case long enough to file a motion for a third extension that *falsely* claimed the second extension had been granted. The Honorable Julien Xavier Neals signed the order for the third extension (based on the false claims that the second extension had been granted). Because those filings were submitted *ex parte* and under seal, Mr. Castelluzzo did not learn of the false statements until the pleadings were unsealed on November 18, 2025.

Mr. Castelluzzo's newly retained attorneys in the civil asset forfeiture case were on the verge of discovering those false statements when the government made an offer to settle the case for $500,000 (five-hundred thousand dollars) on April 30, 2025. After Mr. Castelluzzo refused to settle, the government was forced to abandon Count 1 of its civil complaint because it was barred by the statute of limitations. To "up the ante," the government then switched tactics and pursued a criminal accusation, using it to halt civil discovery and forestall the statutorily required release of the 30,000 ETH because of the violation of the 18 U.S.C. § 983(a)(3)(A) deadline.

The Indictment must be dismissed for several reasons. First, the Indictment insufficiently pleads conspiracy by transactional money laundering under 18 U.S.C. § 1957 since the criminally derived proceeds were *initially* valued at less than the $10,000 statutory threshold. Paragraph 3(a) of the Indictment plainly alleges the ETH was purchased "using approximately 15 units of Bitcoin ("BTC") valued at approximately $9,000, which were the proceeds of the defendant CHRISTOPHER CASTELLUZZO's initial drug trafficking." For that reason, Mr. Castelluzzo could not have *conspired* to violate § 1957 since the criminal derived proceeds were

2

valued at less than the $10,000 threshold. The Indictment also insufficiently pleads the transactional money laundering conspiracy theory because the indictment does not allege any facts that the conduct involved a "monetary transaction" or a "financial institution" as required by statute. Additionally, the Indictment insufficiently pleads conspiracy under the 18 U.S.C. § 1956(a)(1)(B)(i) concealment theory since it fails to identify any "financial transaction" designed by the conspiracy to conceal or disguise the alleged proceeds.

Second, the prosecution is time-barred under the five-year statute of limitations because any alleged agreement to launder drug proceeds necessarily terminated no later than 2015, when the 15 BTC had already been transferred to Mr. Castelluzzo, used to purchase the 30,000 ETH, and both Mr. Castelluzzo and the alleged Conspirator-1 were arrested and incarcerated. By that time, the alleged conspiracy had achieved its only stated objective alleged in the indictment - "to conceal the nature, location, source, ownership, and control of illicit proceeds." The 30,000 ETH sat untouched until 2019 when Mr. Castelluzzo enlisted the person identified as Conspirator-2 to help him secure it while he was incarcerated. The 30,000 ETH was then moved to a cold wallet in 2019, where it sat untouched until it was seized by the FBI in 2022. The Indictment (and the government's evidence) does not allege that any additional proceeds were generated after the arrest of Mr. Castelluzzo and the alleged Conspirator-1 in 2015. Because the Indictment was filed more than five years after the alleged conspiracy terminated, it is barred by the statute of limitations.

Third, the Indictment is duplicitous because it charges two separate conspiracies in its sole count (the earlier of which is barred by the statute of limitations). As noted above, even if the allegations are believed, Mr. Castelluzzo and Conspirator-1 had achieved the purposes of the conspiracy by 2015. The alleged conduct which included Conspirator-2 did not take place for

several more years – and involved totally different conduct and purposes that were completely unforeseeable in 2014-15. Therefore, the sole count of the indictment should be dismissed as duplicitous.

Fourth, the government's oppressive preindictment delay caused a due process violation that requires the dismissal of the Indictment. The authorities made no efforts to seize the 30,000 ETH when Mr. Castelluzzo was arrested in 2015. By March 6, 2020, federal law enforcement officers had obtained an exact copy of the wallet address that held the 30,000 ETH in jail emails. Nevertheless, the government waited until July 2022 to obtain the search warrant. The government then took another 15 months to file the civil asset forfeiture complaint in November 2023, after delaying the case long enough to obtain the third extension while making false statements about a second extension. The government took another 21 months to file the Indictment alleging the same exact facts. Those preindictment delays were designed to unfairly prejudice Mr. Castelluzzo's ability to defend himself against the criminal charge and his property against the forfeiture action.

Fifth, to the extent AUSAs in two jurisdictions made false statements to federal judges in order to avoid the return of property in Colorado, and to obtain the third extension in New Jersey, that conduct constitutes prosecutorial misconduct that warrants dismissal under the Fifth Amendment. The facts and law compel the Court to intervene and restore the integrity of these proceedings.

Sixth, the facts of this case demonstrate the vindictive nature of the prosecution. The government filed the indictment for conspiracy to commit money laundering because Mr. Castelluzzo legally exercised his rights by taking the following actions: (1) filing a Rule 41(g) motion for return of property in Colorado in 2022; (2) claiming his property in the civil asset

4

forfeiture case in 2023; (3) declining the government's settlement offer of $500,000 in 2025; (4) forcing the dismissal with prejudice of Count One of the civil forfeiture case for violating the statute of limitations; and (5) complaining about the government's refusal to comply with its past-due discovery obligations. By filing the criminal charge and requesting to stay the civil asset forfeiture case, the government sought to limit the consequences of its false statements and the 18 U.S.C. § 983(a)(3). Collectively, this conduct was not only calculated, but vindictive.

Seventh, the government illegally singled out Mr. Castelluzzo and selectively prosecuted him precisely because he was exercising his constitutionally and statutorily guaranteed legal rights. The government was aware of three alleged co-conspirators since at least early 2020; however, five years later, they only chose to indict Mr. Castelluzzo – granting cooperating Conspirator-1 effective total use immunity by offering him a non-prosecution agreement, and not prosecuting Conspirator-2.

As a result, this motion seeks dismissal of the Indictment. In the alternative, Mr. Castelluzzo requests an evidentiary hearing to develop the factual record, especially as to the filing of false statements related to obtaining the third extension.

## II.    FACTUAL BACKGROUND

In support of this motion, Mr. Castelluzzo makes the following showing:

1.    In April 2013, Mr. Castelluzzo was arrested by federal authorities and released on bond for an offense that ended in April 2013. *See United States v. 30,000 ETH, Case No. 2:23-cv-21819-JXN-JRA*, ECF No. 1, ¶46 at 18) (filed Nov. 2, 2023) (hereinafter "Civil Complaint").

2.    In 2014, the person identified by the government as "Conspirator-1" sent 15 Bitcoin ("BTC"), worth a total of approximately $9,000, to Mr. Castelluzzo. (*Indictment*, ¶3b).

5

3.    Mr. Castelluzzo used the 15 BTC, worth approximately $9,000, to purchase 30,000 Ethereum ("ETH") as part of the initial coin offering ("ICO") in 2014. (*Indictment*, ¶3b).

4.    In April 2015, Mr. Castelluzzo and the alleged "Conspirator-1" were arrested on New Jersey state charges related to conduct that occurred in 2015 and have remained in custody ever since. (*Civil Complaint*, ¶7 at 4; ¶40 at 15).

5.    On July 30, 2015, when the Ethereum network went live, Mr. Castelluzzo received 30,000 Ethereum ("ETH") pursuant to his participation in the ICO, which were delivered in the standard JSON wallet file format to his email address, castelluzzo@gmail.com, where it remained untouched until 2019. (*Civil Complaint*, ¶108 at 49).

6.    While in prison, Mr. Castelluzzo became aware that the value of his 30,000 ETH was rapidly appreciating. In fact, throughout his incarceration, knowing his calls and emails were monitored and recorded, Mr. Castelluzzo frequently and openly discussed his 30,000 ETH and its extraordinary appreciation to various friends and family.

7.    In April 2019, Mr. Castelluzzo requested help from the person identified as "Conspirator-2" to move the 30,000 ETH from the original JSON wallet into a second wallet, where it remained until the FBI seized it in July 2022. (*Civil Complaint*, ¶31 at 12; ¶48 at 48-49; ¶88 at 41).

8.    During their investigation, federal law enforcement officers reviewed a JPAY email dated March 6, 2020, between "Conspirator-2" and Mr. Castelluzzo that listed the complete address ("0x33FD66A93f296072932dc27e7b9769E3BA5f18A9") of the second wallet holding the 30,000 ETH that was used by the authorities to trace its path on the blockchain. (*Civil Complaint*, ¶108 at 48-49).

9.  Federal law enforcement officers waited until July 7, 2022 to seek a search warrant authorizing them to seize cryptocurrency from the alleged "Conspirator-2", who had access to the second wallet while Mr. Castelluzzo was in prison. (*Civil Complaint*, ¶85 at 40; ¶108 at 48-49).

10. On July 12, 2022, the government executed that warrant by ordering the alleged "Conspirator-2" to give them access to Mr. Castelluzzo's cryptocurrency which was then transferred to an FBI-controlled wallet. (*Civil Complaint*, ¶85-87 at 40).

11. On December 21, 2022, Mr. Castelluzzo filed a Motion for Return of Property under Rule 41(g) in the District of Colorado (hereinafter "Colorado Case"). *See USA v. In the Matter of U.S Government Seizure of Approximately 80,000 Cryptocurrency Tokens*, Case No. 22-y-00375-CNS, ECF No. 1 (D. Colo Dec. 21, 2022).

12. In the Colorado case, the government rightly made the following admission that Mr. Castelluzzo's Rule 41(g) motion constituted a "claim" that triggered the 90-day statutory deadline in 18 U.S.C. § 983(a)(3)(A):

> "As noted above, the government's timeline is not unfettered. Indeed, by virtue of Mr. Castelluzzo's Motion for Return of Property, the Government has now received a claim for the property and is required to file such an action within 90 days of his filing, that is March 22, 2023. *See* 18 U.S.C. § 983(a)(2)(A), (E) & (3)(A); Ali, 306 F.R.D. at 695."

(*Colorado Case*, ECF No. 6, p. 9).

13. The government's admission that it was "required" to file such an action within 90 days complied with DOJ's Justice Manual, 9-112.120 which provides:

> In cases where administrative forfeiture is barred by section 1607, it is not necessary to establish a fixed deadline for commencing a judicial forfeiture action based on the date of the seizure. Congress set no deadline in this instance, and it is not necessary for the Government to adopt one. But the Government should not be free to ignore indefinitely a request made by a potential claimant for the release of his property or for the commencement of formal judicial proceedings.

Accordingly, in a case where the U.S. Attorney receives a such a request in writing, the prosecutor should treat the request as if it were a "claim" referred to in section 983(a)(3)(A), and should thus commence a judicial forfeiture action within 90 days of the receipt of the request.

(See https://www.justice.gov/jm/jm-9-112000-administrative-and-judicial-forfeiture).

14. To comply with the statutory deadline in 18 U.S.C. § 983(a)(3)(A), the Government sought a first extension in New Jersey (hereinafter "Misc. Case"). *See In re Non-Judicial Forfeiture Proceeding as to 29,999.9855341 Ethereum*, No. 2:23-mc-00083-ES, ECF No. 1 (D.N.J. Mar. 20, 2023).

15. That motion for the first extension, filed *ex parte* and under seal on March 20, 2023, admitted that "[i]n response to the Castelluzzo's motion, the United States Attorney's Office for the District of Colorado construed the motion as a claim for the defendant property requiring the Government to file a civil forfeiture action or criminal indictment within 90 days of Castelluzzo's filing—that is, by March 22, 2023." (*Misc. Case*, ECF No. 1 at 2).

16. On March 20, 2023, the Honorable Esther Salas granted the request for the first extension from March 22, 2023, until July 21, 2023 (120 days) in Case No. 2:23-mc-00083-ES on March 20, 2023, which was filed under seal. (*Misc. Case*, ECF No. 2).

17. On the verge of that first extension expiring, Assistant United States Attorneys Robert Frazer, DeNae M. Thomas, and Jordan Anger, prepared a cover letter and motion, along with a proposed order drafted for Honorable John Michael Vazquez, United States District Judge for the District of New Jersey purportedly seeking a second extension from July 21,

2023, to October 19, 2023 (90 days).[1] The cover letter is attached as Exhibit "A" and the unsigned order is attached as Exhibit "B."

18.    A review of the official docket for Misc. Case No. 2:23-mc-00083-ES, finally unsealed on November 18, 2025, confirms that neither the motion seeking a second extension of time nor any order granting that motion was ever filed, docketed, or entered by the Clerk of Court.

19.    Although the first extension expired on July 21, 2023, and no second extension was granted, AUSAs Jordan Anger, Robert Frazer, and DeNae M. Thomas, decided to file a cover letter and motion for a third extension from October 19, 2023, through November 2, 2023 (14 days) on October 19, 2023.[2] (*Misc. Case,* ECF No. 3).

20.    The cover letter to the Honorable Julien Xavier Neals made the following false statement by claiming the motion for the second extension had been granted:

> "Because the Government was previously granted two extensions until October 19, 2023 to file a complaint for forfeiture, the Government respectfully asks the Court to consider its motion and endorse the proposed Order on an expedited basis."

*Id.* (See Exhibit "C").

21.    The motion for the third extension also made false statements to the Honorable Julien Xavier Neals by claiming:

> "The United States represents to the Court as follows:…

---

[1] Those documents related to the second extension were never provided to Mr. Castelluzzo or his attorneys in the Civil Case, but were provided to the Defense on September 25, 2025, in a large batch of documents disclosed in the Criminal Case.

[2] The cover letter and motion for a third extension which contained the false statements, were first discovered by the Defense when the unsealing order for Misc. Case No. 2:23-mc-00083-ES was filed on November 18, 2025. (*Misc. Case*, ECF No. 4).

> (e) On July 14, 2023, the Honorable John Michael Vazquez, United States District Judge in the District of New Jersey, granted the United States' second ex parte motion to extend time to file a civil forfeiture complaint from July 21, 2023 to October 19, 2023."

(*Misc. Case, ECF No. 3, p. 2*).

22.  Based on the false claim that the second extension had been "granted," the Honorable Julien Xavier Neals signed an order granting the third requested extension from October 19, 2023, to November 2, 2023. (*Misc. Case,* ECF No. 3).

23.  The third extension request was also submitted *ex parte* and under seal which placed the government under a heightened obligation to provide complete and accurate information to the Court regarding prior requests and rulings.

24.  The government also made additional false and misleading statements in pleadings filed *ex parte* and under seal in the Colorado Case. For instance, in response to a minute order to "file a status report regarding the status of its investigation on or before 8/15/2023," entered by Judge Charlotte N. Sweeney (*Colorado Case*, ECF No. 20), AUSA Tonya S. Andrews filed a status report on August 15, 2023 (*Colorado Case*, ECF No. 25) that made the following false statements:

> "On July 14, 2023, the United States Attorney's Office for the District of New Jersey filed another Ex Parte Motion and Memorandum of Law to Extend Time to File a Complaint for Forfeiture under seal, seeking until October 19, 2023, to file a civil forfeiture complaint against the seized cryptocurrency Mr. Castelluzzo sought to have returned….
>
> On July 14, 2023, the New Jersey District Court entered a sealed order, extending the time to file a civil forfeiture complaint against the seized cryptocurrency until October 19, 2023 for good cause."

(ECF No. 25, p. 2).

25.  The Colorado court relied on the government's representations regarding the status of the

New Jersey extension requests in recalling and managing the 18 U.S.C. § 983(a)(3)(A)

deadline.

26.  In the status report dated October 31, 2023, filed *ex parte* and under seal, AUSA Tonya S.

Andrews listed the following claims about the second request being "filed," and the third

request being "sought," before claiming "this request was granted":

> 5.      On July 14, 2023, the United States Attorney's Office for the
> District of New Jersey filed another Ex Parte Motion and Memorandum of Law to
> Extend Time to File a Complaint for Forfeiture under seal, seeking until October
> 19, 2023, to file a civil forfeiture complaint against the seized cryptocurrency Mr.
> Castelluzzo sought to have returned.
> 6.      The United States Attorney's Office for the District of New Jersey
> sought another Order to Extend Time to File a Complaint for Forfeiture under
> seal, seeking until November 2, 2023, to file a civil forfeiture complaint against
> the seized cryptocurrency Mr. Castelluzzo sought to have returned.
> 7.      In support of their Motion for another extension, the United States
> Attorney's Office for the District of New Jersey explained that the extension was
> necessary in order to permit the Government sufficient time to ensure the physical
> safety of a witness whose cooperation will likely be revealed when the
> Government files a civil complaint and that without the extension, that witness
> would be in immediate and grave danger.
> 8. This request was granted and [sic] the United States Attorney's Office
> for the District of New Jersey to file a civil complaint."

(*Colorado Case*, ECF No. 33, p. 2) (Exhibit "D").

27.  On November 3, 2023, the AUSA in the Colorado Case filed a more carefully worded

status report, this time using the phrase "sought a few Ex Parte Orders" in paragraph 3,

without using the word "filed" or "granted":

> "Since the government's Response, the United States Attorney's Office for the
> District of New Jersey sought a few Ex Parte Orders to Extend Time to File a
> Complaint for Forfeiture under seal."

(*Colorado Case*, ECF No. 38, p. 1) (Exhibit "E").

28. From the time of the seizure on July 12, 2022, the government held Mr. Castelluzzo's cryptocurrency for over 15 months before filing a civil complaint seeking *in rem* forfeiture of the Defendant Property on November 2, 2023. (*Civil Case*, *ECF No. 1*).

29. Since the first request for an extension from March 22, 2023, until July 21, 2023 (120 days) was granted on March 20, 2023, and no other extension was granted before the July 21, 2023, deadline expired, the civil asset forfeiture case filed on November 2, 2023, missed its statutory deadline by 104 days.

30. On November 3, 2023, a warrant for arrest *in rem* was issued that transferred Mr. Castelluzzo's cryptocurrency from the wallet maintained by the FBI to a wallet maintained by the United States Marshals Service to hold the defendant property until further order of the Court. (*Civil Case*, ECF No. 3 at 1-2).

31. On August 5, 2024, the government served Mr. Castelluzzo with the government's first written discovery requests, which he answered on December 18, 2024, while proceeding *pro se* (*Civil Case,* ECF No. 27, 36). There is no record on the docket that the government ever informed Mr. Castelluzzo that it believed these responses were insufficient or incomplete.

32. On February 10, 2025, Mr. Castelluzzo retained new counsel who filed an entry of appearance in the civil asset forfeiture case. (*Civil Case,* ECF No. 69).

33. Mr. Castelluzzo's counsel sent AUSA Jordan Anger seven (7) emails, dated February 26, 2025, March 4, 2025, March 7, 2025 (collectively, Exhibit "F"), July 15, 2025 (Exhibit "G"), August 2, 2025 (Exhibit "H"), November 14, 2025 (Exhibit "I"),  and December 22, 2025 requesting copies of the motions and orders for extensions since they were still under

seal. (Exhibit "K"). The government found it unnecessary to provide any other information. (see generally, Exhibits F through K).

34. On April 30, 2025, Mr. Castelluzzo's attorney in the civil case received an email from AUSA Jordan Anger offering to settle Mr. Castelluzzo's claim for $500,000 (five hundred thousand dollars). (Exhibit "J").

35. On May 1, 2025, Mr. Castelluzzo's attorney in the civil case served the government with Claimant's First Request for Production of Documents, First Set of Interrogatories, and First Set of Requests for Admission, which each formally requested information about any motions or orders related to extension requests since they were still under seal. (*Civil Case*, ECF No. 95 at 3).

36. After meeting and conferring, the Parties agreed to an extension of time until June 13, 2025, for the government to produce discovery responses. (*Civil Case*, ECF No. 95 at 3).

37. In its Motion to Stay, the government asserts that "the United States exchanged written discovery requests with Castelluzzo's current attorney" on March 14, 2025. (*Civil Case*, ECF No. 92 at 2), though this was an inaccurate characterization of the status of discovery because the only written discovery served by the government was responded to by Mr. Castelluzzo while he was proceeding *pro se*. (*Civil Case*, ECF No. 95 at 3). Thus, unlike the government, Mr. Castelluzzo had no overdue written discovery responses outstanding. (*Civil Case*, ECF No. 95 at 4),

38. On June 11, 2025, two days before the government's discovery responses were due, AUSA Jordan M. Anger and AUSA Adrienne E. Rosen, sent undersigned counsel a letter regarding their decision to "abandon the First Claim for Forfeiture of the civil complaint based on the statute of limitations." In a footnote, the government explained:

13

"Specifically, we are abandoning our claim that 'the Defendant Property subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6) because the Defendant Property constitutes money furnished or intended to be furnished in exchange for a controlled substance or is proceeds traceable to an exchange of moneys or other things of value furnished in exchange for a controlled substance in violation of Title 21, Subchapter 1, of the United States Code.'"

(*Civil Case*, ECF No. 1 at ¶ 121).[3] (Exhibit "L").

39.   In its letter admitting the Statute of Limitations ran on Count 1, the government alleged its "decision to abandon the First Claim for Forfeiture may alter both parties' litigation positions and may cause you to amend your discovery requests and responses. As a result, we believe that the parties should withhold production of any responses to the outstanding discovery requests." *Id.* at 1. Claimant did not agree to that request and made no indication that they intended to revise Mr. Castelluzzo's written discovery requests or the prior discovery responses. (*Civil Case*, ECF No. 95 at 4).

40.   On June 13, 2025, the day discovery responses were due, the government sent a letter to Mr. Castelluzzo's attorney, indicating that it was sending a hard drive containing partial discovery responses which were similar to what had already been provided to Mr. Castelluzzo's prior attorney, Mr. Begley. (*Civil Case*, ECF No. 95 at 5). Nothing else was ever provided in the civil case.

41.   On June 27, 2025, Mr. Castelluzzo's counsel again inquired with the government about the status of the overdue written discovery responses and the purported supplemental document production mentioned in the government's June 13 Letter. *Id.* Mr. Castelluzzo's counsel also served the government with a request to schedule five depositions with proposed dates and served the government a Rule 30(b)(6) deposition notice. *Id.* Within a few hours of

---

[3] On June 26, 2025, the Court entered an Order dismissing with prejudice the First Claim of Forfeiture in the Complaint.  (*Civil Case*, ECF No. 90).

receiving these requests, the government requested to meet and confer with Mr. Castelluzzo's counsel via telephone conference. During that telephone conference, the government informed Mr. Castelluzzo's counsel, for the first time, that the government intended to file a criminal charge against Mr. Castelluzzo and a motion to stay in the civil case. Later that day, the government filed the Criminal Complaint, which laid out the same set of facts that the government alleged in the Search Warrant Application three years earlier and in the Civil Forfeiture Complaint 20 months earlier, providing no new substantive evidence or factual allegations. *Id.*

42. Although the government's discovery responses were due on June 13, 2025, the government waited until June 30, 2025, to file a motion to stay the civil forfeiture action pending resolution of related criminal action. (*Civil Case*, ECF No. 92).

43. The government never provided written responses to Mr. Castelluzzo's Notice to Produce, First Set of Interrogatories, or First Requests for Admission.

44. To date, the Civil Case has *not* been stayed; however, Magistrate Judge Almonte found good cause to stay discovery pending the resolution of the motion to stay the case.

45. On August 7, 2025, a grand jury returned an indictment charging Defendant with conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) ("§ 1956(h)") (money laundering conspiracy) alleging two theories:

    a.  concealment money laundering under 18 U.S.C. § 1956(a)(1)(B)(i); and

    b.  transactional money laundering under 18 U.S.C. § 1957.

46. The indictment alleges Defendant Christopher Castelluzzo conspired with others to conduct financial transactions involving proceeds from drug trafficking beginning "from at least as early as in or around July 2014…through in or around September 2022." (*Indictment*, ¶1).

### III.    ARGUMENT

### A.    The Indictment Insufficiently Pleads Conspiracy under 18 U.S.C. § 1956(h).

On a motion to dismiss, a court reviews the indictment to determine whether it: (1) contains the elements of the offenses intended to be charged, (2) sufficiently apprises the defendant of what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution. *United States v. Vitillo*, 490 F.3d 314, 321 (3d Cir. 2007). An indictment may not merely recite the essential elements of the offense charged, it must allege specific facts that fall within the scope of the relevant criminal statute. *Id.* All facts alleged in the indictment must be taken as true, and the court is to employ a "common sense construction" thereof. *United States v. Hodge*, 211 F.3d 74, 76 (3d Cir. 2000).

In *United States v. Bergrin*, 650 F.3d 257 (3d Cir. 2011), the Third Circuit described the scope of the court's inquiry on a motion to dismiss as a "narrow, limited analysis geared only towards ensuring that legally deficient charges do not go to a jury." *Id.* at 268. As *Bergrin* makes clear, an indictment fails to state an offense if the facts alleged fall beyond the scope of the criminal statute "as a matter of statutory interpretation." *Id.* at 264-65. Although the failure of an indictment to charge an offense can be addressed at any time, the "timing of the defendant's objection is important to the level of scrutiny employed; a defendant who objects to the indictment before trial…is entitled to a more exacting review of the indictment than one who waits until after trial to object." *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000).

In this case, the one-count Indictment alleges a violation of 18 U.S.C. § 1956(h) ("§ 1956(h)") (money laundering conspiracy) under two theories: (1) concealment money laundering

under 18 U.S.C. § 1956(a)(1)(B)(i) which carries a 20 year statutory maximum penalty; and (2) transactional money laundering under 18 U.S.C. § 1957(a) which carries a 10 year statutory maximum penalty. To prove a violation of § 1956(h), the government must prove: "(1) that an agreement was formed between two or more persons; and (2) that the defendant knowingly became a member of the conspiracy." *United States v. Greenidge*, 495 F.3d 85, 100 (3d Cir. 2007). Section § 1956(h) ties the penalty for its violation to the penalty for the crime that is the object of the conspiracy, making it necessary to consider the elements of the underlying money laundering statutes alleged.

1. **The Indictment Insufficiently Pleads the Transactional Money Laundering Theory under 18 U.S.C. § 1957 Since the Criminally Derived Proceeds were Initially Valued at Less than the $10,000 Statutory Threshold.**

The underlying substantive crime of transactional money laundering under 18 U.S.C. § 1957(a) requires the government to prove: "(1) the defendant engage[d] or attempt[ed] to engage (2) in a monetary transaction (3) in criminally derived property that is of a value greater than $10,000 (4) knowing that the property is derived from unlawful activity, and (5) the property is, in fact, derived from 'specified unlawful activity.'" *United States v. Sokolow*, 91 F.3d 396, 408 (3d Cir. 1996) (citation omitted). In this case, the Indictment alleges that in or around July 2014, Mr. Castelluzzo "purchased approximately 30,000 units of Ethereum ("ETH"), valued at approximately $9,000, which were the proceeds of defendant CHRISTOPHER CASTELLUZZO's illegal drug trafficking." ECF No. 8, p. 2. Therefore, the Indictment conclusively demonstrates the initial value of the alleged criminal derived property was valued at less than the $10,000 threshold referenced by 18 U.S.C. § 1957(a).

The issue presented is whether the government can allege a § 1956(h) money laundering conspiracy using a transactional money laundering theory under 18 U.S.C. § 1957, when the

criminal derived property was initially valued at less than $10,000, but eventually appreciated to a value over the $10,000 threshold. In other words, does the $10,000 threshold apply to what was "criminally derived" at the time it was derived (also called the "initial proceeds")?

In *United States v. Wright*, 651 F.3d 764 (7th Cir 2011), the Seventh Circuit squarely addressed that issue, concluding the government failed to prove a violation of § 1957. There, the defendant purchased a property with $8,000 in "drug proceeds," an amount below the statute's $10,000 threshold for the amount that must be involved in a transaction charged under § 1957, which the defendant later sold for approximately $50,000. *Id.* at 771. When determining the $10,000 minimum requirement under § 1957, the court ruled that § 1957 looked to the initial transaction, not the result that might be realized many years later. *Id.* Because the initial transaction involved less than $10,000, the conviction for violating § 1957 had to be set aside. The *Wright* court reasoned:

> "Henderson maintains that the government failed to prove its [§ 1957] charge because the transaction involved less than $10,000 in drug proceeds. Henderson correctly notes that he used only $8,000 in drug proceeds to purchase 203 17th. The government argues, however, that it is not the initial use of the $8,000 that violated § 1957, but rather Henderson's sale of that property resulting in $49,623.20 in proceeds. We think the government's theory puts too much stress on § 1957.
>
> We have previously held that for a § 1957 conviction to be proper, criminally derived property "must first have existed, and then at a later time, the charged party must have attempted to bring about or have actually brought about a transaction with it." *United States v. Lee*, 232 F.3d 556, 559 (7th Cir. 2000) (internal citations omitted).
>
> Here, property was criminally derived when Wright gave the drug money to Lando and Henderson. The transaction triggering a § 1957 violation occurred when Henderson handed over $8,000 of that drug cash to purchase 203 17th. The government now asks us to allow it to choose *ex ante* to ignore this transaction and wait for the proceeds to increase in value beyond $10,000 in order to charge Henderson. We decline the invitation. Because the financial transaction involved less than the $10,000 minimum the statute requires, Henderson's conviction for violating § 1957 must be set aside."

*Id.* at 771-72. In footnote 4, the court explained the policy reasons for focusing on the value of the proceeds at the time of the initial transaction and not its eventual appreciation:

> Section 1957 looks to the initial transaction, not the result that might be realized many years later. During oral argument, we asked the government's attorney this hypothetical question: If a person sold a marijuana cigarette for a dollar and then used the dollar to buy a lottery ticket which turned out to be a one million dollar winner, would that person be in violation of § 1957? The response was yes because the "financial transaction" should be viewed as including, for example, the cashing of the one million dollar lottery check at a bank. We think that goes too far. Similarly, if that same person used $1,000 in proceeds from selling marijuana to buy Apple stock in 2004, would he violate § 1957 if he sold that stock in 2011 for more than $31,000? We think not.

*Id.* Although the holding in *Wright* involved a substantive violation of § 1957, the same logic applies to a § 1956(h) conspiracy to commit a § 1957 violation. Mr. Castelluzzo could not have *conspired* to commit the § 1957 violation when the criminal derived property was valued at less than the $10,000 threshold. As such, this Honorable Court should strike the allegation of the conspiracy based on the transactional money laundering theory using 18 U.S.C. § 1957, since a legally deficient charge must not go to a jury based on the government's flawed statutory interpretation.

## 2. The Indictment Insufficiently Pleads the Transactional Money Laundering Theory under 18 U.S.C. § 1957 as a Matter of Statutory Interpretation Since Cryptocurrency Exchanges are Not a Financial Institution.

To obtain a conviction under 18 U.S.C. § 1957, the government must also prove that the defendant engaged in a "monetary transaction," which is defined in Section 1957(f)(1) as follows:

> the term "monetary transaction" means the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument (as defined in section 1956(c)(5) of this title) by, through, or to a financial institution (as defined in section 1956 of this title), including any transaction that would be a financial transaction under section 1956(c)(4)(B) of this title...

As a preliminary matter, the law in the Third Circuit is not well settled as to whether cryptocurrency—such as the 30,000 Ether ("ETH") alleged here—qualifies as either "funds" or a "monetary instrument" for purposes of § 1957. We believe it does not. More importantly, however, § 1957 requires that the transaction be conducted "by, through, or to a financial institution." *United States v. Ness*, 565 F.3d 73, 78 (2d Cir. 2009) ("[I]n order to sustain a § 1957(a) conviction, a financial institution must have been involved."). In this case, the Indictment does not identify how Mr. Castelluzzo or the alleged co-conspirators agreed to engage in a "monetary transaction" involving "funds or a monetary instrument" moved "by, through, or to a financial institution." Instead, the Indictment alleges only that Mr. Castelluzzo "agreed to engage in domestic and/or international transactions through cryptocurrency exchanges while making misrepresentations as to the source of the specified unlawful activity." (Indictment ¶ 3(b)).

Section 1957 incorporates the definition of "financial institution" set forth in 18 U.S.C. § 1956(c)(6), which in turn incorporates the entities listed in 31 U.S.C. § 5312(a)(2). Although § 5312(a)(2) enumerates twenty-four categories of organizations that qualify as "financial institutions," the term "cryptocurrency exchange" is not included. Nor does the Indictment allege that any cryptocurrency exchange at issue fell within one of the enumerated statutory categories. When determining whether a "cryptocurrency exchange" qualifies as a "financial institution" for purposes of § 1957, courts must first look to the statutory text and give the words of the statute their plain meaning. *See Landreth Timber Co. v. Landreth*, 471 U.S. 681, 687 (1985). If the statutory language is clear and unambiguous, the inquiry ends. *Wilson v. U.S. Parole Comm'n*, 193 F.3d 195, 198 (3d Cir. 1999). In this case, the plain meaning of the term "cryptocurrency exchange" does not bring it within the scope of the statutory definition adopted by Congress.

20

Accordingly, because § 1957 applies only to monetary transactions conducted "by, through, or to" a financial institution as defined by statute, the indictment insufficiently pleads the transactional money-laundering theory under 18 U.S.C. § 1957 as a matter of statutory interpretation.

### 3. The Indictment Insufficiently Pleads the Concealment Money Laundering Theory under 18 U.S.C. § 1956(a)(1)(B)(i) Since it Fails to Allege Any Facts Showing a Design to Conceal or Disguise.

The one-count indictment also alleges a violation of 18 U.S.C. § 1956(h) for money laundering conspiracy under a second theory of concealment money laundering pursuant to 18 U.S.C. § 1956(a)(1)(B)(i). That section requires proof of the following four elements: "(1) an actual or attempted financial transaction; (2) involving the proceeds of [a] specified unlawful activity; (3) knowledge that the transaction involves the proceeds of some unlawful activity; and (4). . . knowledge that the transaction [was] designed in whole or in part to conceal the nature, location, source, ownership, or control of the proceeds of [a] specified unlawful activity." *United States v. Omoruyi*, 260 F.3d 291, 294-95 (3d Cir. 2001).

The indictment relies on the 2014 transfer of the 15 BTC to Mr. Castelluzzo and his use of those 15 BTC to purchase the 30,000 ETH, before making vague assertions not supported by any essential facts, including:

1. the conspirators "agreed to engage in domestic and international transactions designed, in whole or in part, to conceal" proceeds (*Indictment*, ¶ 3(b));

2. the conspirators "agreed to engage in domestic and/or international transactions through cryptocurrency exchanges while making misrepresentations as to the source of the specified unlawful activity proceeds (*Indictment*, ¶ 3(b));

3.  the conspirators "often focused on how they could avoid drawing the attention of banks, exchanges, and law enforcement" and "avoid paying taxes" (*Indictment*, ¶ 3(c));

4.  Mr. Castelluzzo enlisted Conspirator-2 to "store and manage" ETH while he was incarcerated (*Indictment*, ¶ 3(d)); and

5.  Mr. Castelluzzo agreed to compensate Conspirator-2 with ETH for assuming the risk of safeguarding the assets (*Indictment*, ¶ 3(d)).

None of these allegations describes an agreement to conduct a transaction with knowledge that the transaction was designed in whole or in part to conceal the nature, location, source, ownership, or control of the proceeds of a specified unlawful activity.

The intent to conceal or disguise element is not only an element of the substantive money laundering offense, but also an element of the conspiracy to commit concealment money laundering. For example, in *United States v. Richardson*, 658 F.3d 333, 342 (3d Cir. 2011), the Third Circuit vacated the District Court's judgment and remanded for entry of a judgment of acquittal because:

> Viewed as a whole, the evidence was not sufficient to establish knowledge of a design to conceal on Richardson's part. For this reason, we must vacate not only Richardson's money-laundering conviction but also her conviction for conspiracy to commit money laundering. After all, without knowledge of a design to conceal the nature, source, or ownership of the money, Richardson could not have agreed to conceal the nature, source, or ownership of the money.

*Id.* In this case, the indictment's reliance on statements about avoiding scrutiny or minimizing tax exposure underscores its legal insufficiency. The Supreme Court has made clear that concealment money laundering requires proof that the transaction itself was designed to conceal or disguise proceeds—not merely that the defendant hoped to avoid detection. *Regalado Cuellar v. United States*, 553 U.S. 550, 556 (2008). Passive custody of assets—even assuming awareness

22

of their unlawful origin—does not constitute money laundering. *See United States v. Gotti*, 457 F. Supp. 2d 411, 422 (S.D.N.Y. 2006) ("not every transaction that can be traced to criminal proceeds necessarily qualifies as money laundering.").

Courts have consistently rejected concealment theories where the alleged conduct reflects personal asset management, passive retention, straightforward transactions, or generalized efforts to avoid attention. *See, e.g.*, *United States v. Johnson*, 440 F.3d 1286, 1292–93 (11th Cir. 2006) ("simple and straight forward banking transactions, easily discovered through a cursory review of [defendant's] bank accounts" were not money laundering); *United States v. Esterman*, 324 F.3d 565, 572 (7th Cir. 2003) ("Cases in which money laundering charges have not succeeded are typically simple transactions that can be followed with relative ease."); *United States v. Garcia-Emanuel*, 14 F.3d 1469, 1474 (10th Cir. 1994) ("If transactions are engaged in for present personal benefit, and not to create the appearance of legitimate wealth, they do not violate the money laundering statute."). Here, the indictment alleges no essential facts to describe any transaction designed to create the appearance of legitimate wealth, no layering, no structuring, no conversion, and no movement through financial institutions. Discussions about avoiding taxes or scrutiny—without an alleged transactional mechanism—are legally insufficient as a matter of statutory interpretation. As a result, the defense is left guessing what Mr. Castelluzzo allegedly agreed to do that would violate either money-laundering statute. Therefore, the indictment fails to serve its core constitutional functions under the Fifth and Sixth Amendments. *See Russell v. United States*, 369 U.S. 749, 765–69 (1962).

In *Pirro*, the United States appealed an order of the district court dismissing allegations of an indictment charging Pirro with failing to report an ownership interest on the income tax return of an S Corporation, in violation of 26 U.S.C. § 7206(1). *Id.* at 87. The trial court's

dismissal of the charge was upheld on appeal. *Id.* The court found the indictment failed to allege the essential facts constituting the offense since the allegations concerned esoteric areas of federal tax law where it is rare that a "simple, direct statement of the law can be made without caveat." *Id.* at 90. (citations omitted). Likewise, in this case, the government resorted to vaguely alluding to the conspirators often focusing on "how they could avoid paying taxes" which necessarily covers both legal and theoretically illegal actions. An indictment that does not identify the transaction contemplated by the conspiracy "neither notifie[s] the defendant of the gist of the charges against him, nor allow[s] the court to ascertain that the charges were legally valid." *Id.* at 93. An indictment that fails to allege the essential elements of the crime charged offends both the Fifth and Sixth Amendments of the United States Constitution. *Id.* Like in *Pirro*, this Court should conclude that the indictment does not charge a crime.

**B.    The Indictment Fails to Allege a Money-Laundering Conspiracy that Continued into the Five-Year Statute of Limitations Period.**

The statute of limitations for non-capital federal offenses is five years. 18 U.S.C. § 3282(a). Once a defendant raises a statute-of-limitations defense, the government bears the burden of proving that the charged offense occurred within the limitations period. *Musacchio v. United States*, 577 U.S. 237, 246–48 (2016). This rule applies equally to conspiracy offenses, including non-overt-act conspiracies. *Smith v. United States*, 568 U.S. 106, 113 (2013); *Grunewald v. United States*, 353 U.S. 391, 396 (1957). Although 18 U.S.C. § 1956(h) does not require proof of an overt act, the government must still prove that "the conspiracy as contemplated in the agreement" existed within the limitations period. *Grunewald*, 353 U.S. at 396; *see also Smith*, 568 U.S. at 113. A conspiracy terminates when its object is accomplished or when the participants can no longer advance it. *Grunewald*, 353 U.S. at 401–02.

In this case, the indictment filed on August 7, 2025, alleges the 15 Bitcoin transferred to Mr. Castelluzzo from Conspirator-1 in 2014, constituted proceeds of specified unlawful activity described as the "distribution of controlled substances," or "drug trafficking" (*Indictment*, ¶ 1, 3.a.). No other "proceeds" are alleged. Furthermore, the indictment alleges no subsequent creation of criminal proceeds, no continuing flow of illicit funds, and no new laundering objective after that point. In fact, the indictment lists only one goal of the conspiracy: "to conceal the nature, location, source, ownership, and control of illicit proceeds, including drug trafficking proceeds." (*Indictment*, ¶ 2). On the face of the indictment, it is obvious that any agreement to launder those criminal proceeds necessarily began—and ended—with that alleged 2014 transaction involving Conspirator-1 transferring 15 BTC to Mr. Castelluzzo, and Mr. Castelluzzo using the 15 BTC to purchase the 30,000 ETH. At that point when Mr. Castelluzzo was "paid out" from the alleged drug trafficking proceeds the conspirators would have completed the purpose of the alleged conspiracy. Mr. Castelluzzo could not have foreseen the 30,000 ETH appreciating to values that exceeded millions of dollars. But for the completely unforeseeable appreciation of the 30,000 ETH, Mr. Castelluzzo would not have needed any help maintaining that asset or considering the new legal and financial risks that resulted from that type of appreciation. The same would be true for the winner of the Powerball lottery. Only after winning the Powerball lottery would unique legal and financial risks be triggered by such a large windfall. The reactions to those risks and the actions needed to preserve the asset and determine the best way to deal with the tax and other legal consequences, would be *fundamentally* different from anything that existed before the ticket won, making those risks completely unforeseeable at the time of the purchase.

For these reasons, the indictment alleges two conspiracies. The original conspiracy alleges the transfer of the 15 BTC to Mr. Castelluzzo and his purchase of the 30,000 ETH. The second conspiracy did not occur until the 30,000 ETH began to rapidly appreciate in a way that could not have been foreseen at the time of the first conspiracy ended. The indictment alleges a second conspiracy that occurred when "Conspirator-2 was enlisted to store and manage the ETH...." (*Indictment*, ¶ 4). This prosecution is motivated by the government's desire to forfeit the 30,000 ETH long after the statute of limitations expired for any substantive offense or related conspiracy that would have occurred in 2014. Only by attempting to combine the two alleged conspiracies, or by alleging the second conspiracy extended the first, could the government hope to avoid a prosecution barred by the statute of limitations.

The government's attempt to extend the original conspiracy in Mr. Castelluzzo's case is prohibited by *Grunewald v. United States*, 353 U.S. 391 (1957). The *Grunewald* decision is not merely a statement of abstract limitations principles—it is a fact-driven rejection of the exact maneuver the government attempts here. In *Grunewald*, the defendants were charged with conspiring to defraud the United States by corruptly influencing the Bureau of Internal Revenue (BIR) to secure favorable tax rulings. *Id.* at 393–95. The substantive objective of the alleged conspiracy—obtaining the favorable tax treatment—was fully accomplished by 1948. *Id.* at 395. Because the indictment was returned more than five years later, the government sought to avoid the statute of limitations by arguing that the conspiracy continued beyond 1948 due to later acts of concealment. *Id.* Specifically, the government pointed to later efforts by the defendants to keep the scheme secret, including one conspirator attempting to have the Bureau of Internal Revenue report "doctored," covering up the traces of the cash fees paid to Grunewald, causing the disappearance of certain records linking him to Grunewald, warning the taxpayers repeatedly

to keep quiet, taking steps to induce the taxpayers not to reveal the conspiracy, and Grunewald asking his secretary not to talk to the grand jury. *Id.* at 395–96. In rejecting the government's theory that these facts extended the conspiracy beyond the statute of limitations, the Supreme Court recognized that once the central criminal objective of a conspiracy has been achieved, later acts undertaken to avoid detection do not extend the conspiracy unless concealment itself was an express or implicit objective of the original agreement. *Id.* at 401–02. The Court emphasized that allowing such post-hoc concealment to extend conspiracies would "effectively wipe out the statute of limitations in conspiracy cases." *Id.* at 402. Critically, the Court did not deny that concealment occurred. Instead, it held that concealment that is merely a natural byproduct of completing a crime is legally insufficient to extend a conspiracy. *Id.* at 403–04. The relevant inquiry is not whether later conduct helped preserve the fruits of the crime, but whether that conduct was part of the original conspiratorial bargain. *Id.* at 399–401.

In *Grunewald*, the Supreme Court identified three decisive features that terminated the conspiracy. First, the conspiracy had a discrete, completed objective. The agreement was to corruptly obtain favorable tax treatment. Once that outcome was achieved, "the central criminal purpose of the conspiracy had been attained." *Id.* at 401. Second, later acts were reactive, not forward-looking since the alleged concealment occurred only after the scheme was complete and only in response to the risk of investigation. *Id.* at 402–03. These acts did not further the original objective; they merely sought to avoid consequences. Third, the later conduct was not contemplated at the outset. In *Grunewald*, the Court refused to infer that concealment years later was part of the original agreement absent specific allegations or proof. *Id.* at 399–401. Without such proof, the conspiracy necessarily terminated when its objective was accomplished. After

analyzing those factors, the Court held that the conspiracy ended outside the limitations period and reversed the convictions. *Id.* at 405.

The indictment against Mr. Castelluzzo fails under *Grunewald* for the same reasons. First, the indictment alleges a single, discrete objective: the concealment of alleged drug proceeds accomplished with the 2014 transfer of 15 BTC to Mr. Castelluzzo and the purchase of 30,000 ETH. Once that transaction occurred, the alleged proceeds were fully converted, possessed and paid out to Mr. Castelluzzo. The indictment does not allege that the later agreement with Conspirator-2 was part of the original 2014 agreement, nor could it plausibly do so. Second, the government relies entirely on later, reactive conduct to unforeseen circumstances to extend the conspiracy. The alleged involvement of "Conspirator-2" years later occurred only because unforeseeable and extremely unusual circumstances forced Mr. Castelluzzo to react to the unimaginable appreciation of the 30,000 ETH. That conduct did not advance the original laundering objective; it responded to new unexpected circumstances that arose long after the alleged conspiracy had ended. Under *Grunewald*, such reactive conduct cannot extend a conspiracy. Third, the later conduct was not—and could not have been—contemplated in 2014. Unlike *Grunewald*, where the government at least argued that secrecy was inherent in the scheme, the government here cannot plausibly claim that the original agreement contemplated the increase in ETH's value to tens or hundreds of millions of dollars. *Grunewald* forbids rewriting the scope of a conspiracy based on hindsight to avoid the statute of limitations. *Id.* at 399–401.

The government's attempt to treat later asset management as a continuation of the conspiracy is even weaker than the theory rejected in *Grunewald*. There, the government pointed to affirmative acts of concealment directed at investigators. Here, the government points

28

primarily to passive retention and safeguarding of an already acquired asset. *Grunewald* makes clear that even affirmative concealment does not extend a conspiracy unless it was part of the original plan. *Id.* at 402. If coordinated false statements to federal investigators were insufficient in *Grunewald*, then mere asset preservation—prompted by the unforeseen and extraordinary market appreciation—cannot possibly suffice here. Because the indictment was returned in 2025—more than five years after the conspiracy ended—it is barred by 18 U.S.C. § 3282(a) and must be dismissed. This defect is apparent from the face of the indictment.

### C.    The Sole Count of the Indictment Is Duplicitous Because It Impermissibly Merges Two Separate Agreements in an Effort to Avoid the Statute of Limitations.

In *United States v. Starks*, 515 F.2d 112 (3d Cir. 1975), the court listed the problems with duplicity by joining in a single count two or more distinct and separate offense:

> One vice of duplicity is that a general verdict for a defendant on that count does not reveal whether the jury found him not guilty of one crime or not guilty of both. Conceivably this could prejudice the defendant in protecting himself against double jeopardy.
>
> Another vice of duplicity is that a general verdict of guilty does not disclose whether the jury found the defendant guilty of one crime or of both. Conceivably, this could prejudice the defendant in sentencing and in obtaining appellate review.
>
> A third vice of duplicity is that it may prejudice the defendant with respect to evidentiary rulings during the trial, since evidence admissible on one offense might be inadmissible on the other. Joining conspiracy and substantive offenses in the same count present this vice in a particularly aggravated form, because of the admissibility of declarations made by coconspirators. Assuming such a joinder, and a general guilty verdict, there would ordinarily be no way of discerning whether the jury found the defendant guilty of the offense in proof of which such coconspirator's admissions were properly admitted.
>
> Finally, there is no way of knowing with a general verdict on two separate offenses joined in a single count whether the jury was unanimous with respect to either.

*Id.* at 116-117 (formatting added). In the *Starks* case, the court found that the indictment improperly charged two separate violations in a single count. *Id.* The Third Circuit held that the

trial court erred in denying the defendants' pre-trial motions to dismiss or require the government to elect a single charge. *Id.*

Another Third Circuit case, *United States v. Kelly*, 892 F.2d 255, 259 (3d Cir. 1989), applied a three-factor test to determine whether conduct constitutes a single conspiracy or multiple conspiracies: (1) whether there was a common goal; (2) whether the agreement contemplated a continuous result requiring continuous cooperation; and (3) the extent of overlap among participants. Applying these factors in this case demonstrates that the indictment alleges two different and separate offenses, not one.

In this case, the Indictment joins in a single count, allegations related to two distinct and separate conspiracies including: (1) the alleged conspiracy in 2014 (which could have been alleged as a substantive offense but for the statute of limitations problem) that involved the transfer of 15 BTC to Mr. Castelluzzo who used them to purchase the 30,000 ETH; and (2) the alleged conspiracy of enlisting Conspirator-2 from 2019 to 2022 to maintain and manage the 30,000 ETH while Mr. Castelluzzo was incarcerated. The problem remains, however, that there was no common goal between those two wholly distinct offenses that were separated by several years of inactivity, involved different participants, different objectives, and no demonstrated interdependence. That merger of these two distinct offenses creates precisely the risks the rule against duplicity is designed to prevent, including the risk of a non-unanimous verdict. Where a count is duplicitous, courts may dismiss the count, require the government to elect which conspiracy it intends to prosecute, or provide a specific unanimity instruction. *Starks*, 515 F.2d at 116–17. Here, dismissal is warranted. At a minimum, the government must be required to elect whether it is proceeding on the 2014–2015 conduct or the 2019–2022 conduct. Because the

30

former is outside the five-year statute of limitations, the government cannot lawfully prosecute both as a single conspiracy under § 1956(h).

### D.    The Indictment Must Be Dismissed for Oppressive Pre-Indictment Delay in Violation of Due Process.

Although the statute of limitations provides the primary protection against stale criminal charges, the Due Process Clause independently prohibits oppressive pre-indictment delay where the defendant establishes: (1) that the delay was an intentional device by the government to gain a tactical advantage, rather than the result of ordinary investigative delay; and (2) actual, substantial prejudice to the right to a fair proceeding. *United States v. Marion*, 404 U.S. 307, 324 (1971); *United States v. Lovasco*, 431 U.S. 783, 789-90 (1977).

In this case, the record shows the delay was intentional and aimed at gaining a tactical advantage. Mr. Castelluzzo purchased the 30,000 ETH in 2014, while on federal pretrial release, using his email address: castelluzzo@gmail.com (the same email address discussed during his federal trial on the 2013 charges). On July 30, 2015, when the Ethereum network went live, Mr. Castelluzzo received 30,000 Ethereum ("ETH") pursuant to his participation in the ICO, which was delivered in the standard JSON wallet file format to the same email address. (*Civil Complaint*, ¶108 at 49). Law enforcement could have discovered the 30,000 ETH simply by looking at his emails in 2014 or 2015, although the 30,000 ETH had such little value that a forfeiture would have been pointless. Instead, the government waited until July 2022 to obtain a warrant after the 30,000 ETH became exponentially more valuable, and then waited until June 2025 to charge Mr. Castelluzzo – all based upon information the government possessed years earlier.

After the seizure, Mr. Castelluzzo retained counsel to file a Rule 41(g) Motion for Return of Property that attached his verified claim. The government admitted that the pleadings

31

constituted a "claim" under 18 U.S.C. § 983(a)(3)(A) that triggered the 90-day statutory deadline that ran on March 22, 2023. That admission complied with DOJ's Justice Manual, 9-112.120 which required the U.S. Attorney to treat the request as if it were a "claim" referred to in section 983(a)(3)(A)" and "commence a judicial forfeiture action within 90 days of the receipt of the request." In *United States v. $80,891.25*, 2011 WL 6400420, at *2 (S.D. GA December 19, 2011), the court found that dismissal was required where the complaint was filed outside CAFRA deadline based on a judicial admission made by the government.

The government then acted in accordance with its judicial admission that the statutory deadline ran on March 22, 2023, by filing a first motion to extend it until July 21, 2023. On the verge of that first extension expiring, the government prepared a cover letter and motion, along with a proposed order drafted for Honorable John Michael Vazquez. Those documents were provided to the Defense in a large batch of discovery on September 25, 2025. A review of the official docket for Misc. Case No. 2:23-mc-00083-ES, which was unsealed on November 18, 2025 (Misc. Case, ECF No. 4), confirms that the motion and order were never filed.

The first extension expired on July 21, 2023. Nevertheless, AUSAs Jordan Anger, Robert Frazer, and DeNae M. Thomas, delayed the case until October 19, 2023, when they filed a cover letter and motion for a third extension from October 19, 2023, through November 2, 2023 (14 days (*Misc. Case*, ECF No. 3). The cover letter to the Honorable Julien Xavier Neals made the following false statement: "Because the Government was previously granted two extensions until October 19, 2023 to file a complaint for forfeiture, the Government respectfully asks the Court to consider its motion and endorse the proposed Order on an expedited basis." *Id.* The motion for the third extension made another false statement by claiming: "The United States represents to the Court as follows:… (e) On July 14, 2023, the Honorable John Michael Vazquez, United

32

States District Judge in the District of New Jersey, granted the United States' second ex parte motion to extend time to file a civil forfeiture complaint from July 21, 2023 to October 19, 2023." (Misc. Case, ECF No. 3, p. 2). At the time the third extension was requested on October 19, 2023, the Court lacked authority to extend the § 983(a)(3)(A) deadline because the only valid extension had expired on July 21, 2023. The Courts "have consistently held that an extension must be requested before the complaint deadline has elapsed, and that retroactive extensions are not permitted." *United States v. 2014 Mercedes-Benz GL350BLT, VIN: 4JGDF2EE1EA411100*, 162 F. Supp. 3d 1205, 1210 (M.D. Ala. 2016) (collecting cases). Based on the false claim that the second extension had been "granted," the Court signed an order granting the third requested extension from October 19, 2023, to November 2, 2023. The third extension request was submitted *ex parte* and under seal which placed the government under a heightened obligation to provide complete and accurate information to the Court regarding prior requests and rulings.

Before filing the civil asset forfeiture case, the government also made false and misleading statements in pleadings filed in the Colorado Case. For instance, the status report filed on August 15, 2023 (Colorado Case, ECF No. 25) falsely claimed: "On July 14, 2023, the New Jersey District Court entered a sealed order, extending the time to file a civil forfeiture complaint against the seized cryptocurrency until October 19, 2023 for good cause." (ECF No. 25, p. 2). The Colorado court relied on the government's representations regarding the status of the New Jersey extension requests in recalling and managing the § 983(a)(3) deadline. In a status report dated October 31, 2023, filed *ex parte* and under seal, the same AUSA referenced details about the first, second, and third request for an extension before claiming "this request was granted." (Colorado Case, ECF No. 33, p. 2) (Exhibit "D"). On November 3, 2023, the AUSA in the Colorado Case filed a more carefully worded status report, this time using the phrase "sought

a few Ex Parte Orders" in paragraph 3, without using the word "filed" or "granted." (Colorado Case, ECF No. 38, p. 1) (Exhibit "E").

To date, the government has never filed any corrective notice, amendment, or clarification advising the Court in the District of Colorado or the District of New Jersey that the second extension was never "filed" or "granted" even though the Honorable Julien Xavier Neals was also assigned to preside over the Civil Case filed on November 2, 2023. As a result, Mr. Castelluzzo has shown that the delay was an intentional device by the government to gain a tactical advantage to conceal misconduct and avoid an order to return the property, rather than the result of ordinary investigative delay.

Since the government missed the Section 983(a)(3)(A) deadline, the proper relief was an order to "promptly release the property" so the government "may not take any further action to effect the civil forfeiture of such property in connection with the underlying offense" as required by 18 U.S.C. § 983(a)(3)(B). Courts consistently hold that the Section 983(a)(3)(A) deadline is enforceable through dismissal when the government fails to comply. *See In re $8,508.63 from PNC Bank Account x1775, Misc. Action No. 17-136*, 2018 WL 3427635, at *4 (E.D. Pa. July 16, 2018). Instead, the government not only failed to return Mr. Castelluzzo property, but it drained him of any resources to challenge the taking causing prejudice. He hired an attorney to file and litigate the Rule 41(g) Motion for Return of Property in Colorado, and an attorney to fight the civil asset forfeiture case in New Jersey. During both cases, the government attempted to cover up its wrongdoing by not releasing the sealed documents repeatedly requested by Mr. Castelluzzo's attorneys and offering him $500,000 to settle. As that misconduct was being discovered, the government filed the criminal charge to obtain a stay of the civil case so they would not have to return the property. Additionally, the government used the civil asset

forfeiture case to obtain discovery responses from Mr. Castelluzzo, while its responses remained past due. Those additional delays were particularly impactful since the allegations went back to 2014. The crux of the case depends on whether the 15 BTC used to acquire the 30,000 ETH in 2014 were tainted proceeds. Establishing the lawful origin of early Bitcoin holdings depends on contemporaneous records and third-party evidence that existed at the time of the transactions. By waiting more than eleven years to bring charges, the government substantially impaired Mr. Castelluzzo's ability to obtain those records and evidence which gave the government a tactical advantage.

### E.    The Government's False Statements Concerning the Second Extension Constitute Prosecutorial Misconduct that Warrants Dismissal under the Fifth Amendment.

Mr. Castelluzzo's prosecution is the result of prosecutorial misconduct that necessitates dismissal. "But for" the false statements used to obtain the third extension which mislead the courts in two jurisdictions, Mr. Castelluzzo's motion for return of property would have been granted since the government missed the statutory deadline required by Section 983(a)(3)(A). When the government failed to "file an indictment, civil complaint or return the property" within the statutory deadline, the proper relief was an order to "promptly release the property" and finding that the government "may not take any further action to effect the civil forfeiture of such property in connection with the underlying offense." 18 U.S.C. § 983(a)(3)(B). Those false statements to the Court and the refusal to disclose that problem to Mr. Castelluzzo and his attorneys caused him significant harm and prejudice. It likely precipitated the government's settlement offer. When that offer was rebuffed, in an effort to prevent Mr. Castelluzzo from discovering these false statements, which at the time were imbedded within a sealed docket, the

government brought this flawed prosecution. The government's conduct must not be rewarded. Rather, the Indictment must be dismissed.

"Courts rely on lawyers' honesty; lawyers may not mislead them." *Wharton v. Superintendent Graterford SCI*, 95 F.4th 140, 143 (3d Cir. 2024). "As officers of the court, lawyers must be candid and forthright. They must be completely truthful." *Id.* at 148. Making false statements would also constitute a violation of N.J. Ct. R. Prof. Conduct 3.3(a)(1) and (5). The ethical rules for prosecutors provide: "The prosecutor should not make a statement of fact or law, or offer evidence, that the prosecutor does not reasonably believe to be true, to a court...." Am. Bar Ass'n, *Criminal Justice Standards for the Prosecution Function* Section 3-1.4(b) (4th ed. 2017). "Rule 11 [of the Federal Rules of Civil Procedure] also imposes an implied 'duty of candor' which attorneys violate whenever they misrepresent the evidence supporting their claims. Thus, a court may sanction attorneys, [law firm, or party], under Rule 11(b)(3) for factual assertions they know – or after reasonable investigation should have known – are false or wholly unsupported." *Wharton*, 95 F.4th at 148 (quoting *King v. Whitmer*, 71 F.4th 511, 521 (6th Cir. 2023) (Kethledge, J.) (citation omitted)). The Wharton Court further described the significance of candor to the court:

> Candor means more than just not lying. It also means not saying things "that are literally true but actually misleading.' *In re Taylor*, 655 F.3d 274, 283 (3d Cir. 2011). And it means steering clear of 'half-truths, inconsistencies, mischaracterizations, exaggerations, omissions, evasions, and failures to correct known misimpressions created by [the lawyers'] own conduct.' *Six v. Generations Fed. Credit Union*, 891 F.3d 508, 511 (4th Cir. 2018).

*Id.* Candor is especially critical when proceedings are nonadversarial. At *ex parte* hearings, for instance, "the customary checks and balances do not pertain – and the court is entitled to expect an even greater degree of thoroughness and candor." *Me. Audubon Soc'y v. Purslow*, 907 F.2d 265, 268 (1st Cir. 1990). Courts must rely on the lawyers because their submissions are one-

sided. But that leaves courts "vulnerable to being misled, whether by affirmative misrepresentations or by half-truths that deceive[] through their incompleteness." *Ark Tchr. Ret. Sys. V. State St. Corp.*, 25 F.4th 55, 65 (1st Cir. 2022). In *Government of the Virgin Islands v. Fahie*, 419 F.3d 249 (3d Cir. 2005), the Third Circuit held that dismissal with prejudice may be proper when there is deliberate misconduct by a prosecutor and prejudice to the defendant.

In this case, the record demonstrates the criminal charge was brought against Mr. Castelluzzo to minimize the airing and consequences of the government's deception and error. The prejudice to Mr. Castelluzzo is significant. Because the government missed their statutory deadline under 18 U.S.C. § 983(a)(3)(A), Mr. Castelluzzo was entitled to the immediate return of his property. That could have been ordered by the court in Colorado had the AUSA's pleadings not falsely alleged the second extension had been granted when it had not. Instead, to avoid that result, the AUSAs decided to charge Mr. Castelluzzo with a serious criminal offense – one that the very same U.S. Attorney's office had declined to bring for several years prior. It is not beyond peradventure that one reason a criminal case was brought against Mr. Castelluzzo was because of the government's false statements and omissions to the Court.

Dismissal with prejudice, therefore, is warranted. The *Fahie* standard and Rule 11's central goal are to deter such egregious conduct. Any sanction short of dismissal (especially in light of the other glaring constitutional, statutory, and procedural violations detailed above) would not deter the government from repeating this conduct. Therefore, we respectfully request that the Court dismiss the Indictment with prejudice.

F.      **Dismissal Is Appropriate Because the Indictment Is a Result of a Vindictive Prosecution.**

Mr. Castelluzzo respectfully moves this Court to dismiss the Indictment because it violates the Due Process Clause as a vindictive prosecution, brought to penalize Mr. Castelluzzo

for exercising his statutory and constitutional rights. As noted above, the government's accusations target Mr. Castelluzzo's purchase of the 30,000 ETH in 2014. The government waited until 2022, once the ETH had appreciated significantly in value, to seize the asset. Even then, the case proceeded solely on a civil track for years. It was not until (1) Mr. Castelluzzo hired counsel experienced in civil forfeiture actions; (2) made deposition and other specific discovery demands (which would have revealed the AUSAs false statements regarding the requests for extensions and cause for dismissal of the civil forfeiture action), and (3) Mr. Castelluzzo refused to accept the government's offer to settle the civil forfeiture action for half a million dollars, that the government – on the exact same set of facts available to it since 2022 – vindictively and selectively prosecuted Mr. Castelluzzo.

"To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort." *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978). Thus, it is a due process violation for a prosecutor to bring a more severe charge against a defendant in retaliation for asserting a procedural right. *Blackledge v. Perry*, 417 U.S. 21, 27-28 (1974). Moreover, the mere "fear of such vindictiveness may unconstitutionally deter a defendant's exercise" of procedural rights.  *Id*. at 28. A vindictive prosecution is one in which the government is retaliating against someone who was "exercising a protected statutory or constitutional right." *United States v. Goodwin*, 457 U.S. 368, 372 (1982).

Accordingly, the Supreme Court has established a vindictive-prosecution doctrine that protects a defendant not only from *actual* vindictiveness, but also from the *reasonable apprehension* of such vindictiveness. *Blackledge*, 417 U.S. at 28. Vindictive prosecution can be proven either of these ways. First, "actual vindictiveness" occurs when there is direct evidence that the prosecutor harbored a personal animus toward the defendant. *United States v. Esposito*,

968 F.2d 300, 303 (3d Cir. 1992). Second, a defendant can succeed by showing "a reasonable likelihood of a danger that the [government] might be retaliating against the accused for lawfully exercising a right." *Id*. (citing *Goodwin*, 457 U.S. at 372). In the latter situation, courts apply a "presumption of vindictiveness." To overcome that presumption, the government must show "legitimate, objective reasons for its conduct." *United States v. Paramo*, 998 F.2d 1212, 1220 (3d Cir. 1993). "Upping the ante" by the prosecution after the defendant has asserted a procedural right is the type of circumstance that tends to create a reasonable apprehension of vindictiveness. *See Blackledge*, 417 U.S. at 28. When circumstances support the presumption of vindictiveness, the burden shifts to the government to disprove it. *United States v. Schoolcraft*, 879 F.2d 64, 68 (3d Cir. 1989).

Notably, the dismissal of charges for vindictive prosecution does not require a finding that the prosecutor acted in bad faith. *United States v. Andrews*, 633 F.2d 449, 454-55 (6th Cir. 1980). "A standard of 'realistic likelihood of vindictiveness' allows the barring of charges in appropriate situations without the need to find that the prosecutor acted in bad faith." *Id*. at 455. Rather the dismissal of charges simply indicates that the prosecution acted in a way that gave rise to a reasonable apprehension of vindictiveness, which could not be affirmatively dispelled. *See Id*. From the viewpoint of a reasonable person, this belated choice to prosecute rather than proceed via civil forfeiture indicates that the new theory was adopted vindictively to punish. *See United States v. LaDeau*, 734 F.3d 561 (6th Cir. 2013); *United States v. Motley*, 655 F.2d 186, 189 (9th Cir. 1981); *United States v. Cafiero*, 292 F.Supp. 2d 242 (D. Mass. 2003).

*LaDeau* is particularly instructive. Initially, LaDeau was charged with possessing child pornography with a sentencing range of 0 to 10 years of imprisonment. *Id.* at 564. LaDeau moved to suppress evidence. *Id.* After the district court granted the motion, the government

sought and obtained a superseding one-count indictment charging him with conspiring to *receive* child pornography – a charging decision that subject LaDeau to a five-to-twenty-year prison term. *Id.* The government obtained no new evidence during the period between the two indictments. LaDeau moved to dismiss the superseding indictment. The District Court agreed with LaDeau that the government's decision to change to a *receipt* theory warranted a presumption of prosecutorial vindictiveness, because there was a realistic likelihood that LaDeau was being charged with a more serious offense in retaliation for his successful suppression motion.  The Sixth Circuit affirmed the dismissal.

The instant case presents an even more extreme example of vindictiveness. Mr. Castelluzzo was exercising his right to claim ownership in the Civil Forfeiture Case through retained counsel. With no new facts or information, the government "upped the ante;" in *LaDeau* by superseding with a more serious offense and here, by charging Mr. Castelluzzo for the first time. The government's decision, on the heels of (1) counsel's discovery requests that would expose the government's false statements to the court; and (2) Mr. Castelluzzo's rejecting the settlement offer, proves vindictiveness.

In *Motley*, the prosecution decided to replace RICO and conspiracy charges with easier-to-prove drug charges under 21 U.S.C. § 841, but that change in tactics increased the potential sentence the defendant faced. "What the government needs to justify, however, is not the change in the nature of the charges in the indictment, but the increase in the severity of the charges in the indictment." *Motley*, 655 F.2d at 189. That requirement follows from the fact that the vindictive-prosecution doctrine has an important prophylactic purpose: a change in severity, even if reasonably grounded in doubts about the original choice to not prosecute, will cause the reasonable apprehension that the prosecution is vindictive.

40

Here, as in *LaDeau* and *Motley*, the government made a deliberate choice to adopt charges that would expose the defendant to a longer sentence after the defendant exercised his rights. Such circumstances lead a reasonable person to "think there existed a reasonable likelihood of vindictiveness," *Andrews*, 633 F.2d at 454, and thus the government must disprove vindictiveness. Absent that, the Court should dismiss the indictment.

### G.   Dismissal under the Due Process Clause of the Fifth Amendment Is Required Because There Is Clear Evidence of Selective Enforcement and Prosecution.

The Equal Protection Clause of the Fifth Amendment protects criminal defendants against "selective enforcement" and "selective prosecution." *United States v. Washington*, 869 F.3d 193, 214 (3d Cir. 2017); *United States v. Frederick Douglass*, 82 F.4th 1122, 1140 (D.C. Cir. 2023). Those constitutional protections are meaningful guardrails that restrict the otherwise broad discretion of law-enforcement officials and prosecutors to investigate and bring criminal charges. "[A]lthough prosecutorial discretion is broad, it is not unfettered" because "executive discretion" in criminal law enforcement is "subject to constitutional constraints" and "stops short of "unlawful favoritism." *Frederick Douglass*, 82 F.4th at 1137 (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985); *United States v. Batchelder*, 442 U.S. 114, 125 (1979)).

A decision to prosecute is selective and violates the right to equal protection when it is made on a discriminatory basis with an improper motive. *Schoolcraft*, 879 F.2d at 68. To establish selective prosecution, a defendant must demonstrate that (1) persons similarly situated have not been prosecuted; and that (2) the decision to prosecute was made on the basis of an unjustifiable standard which may be to prevent the defendant from exercising a fundamental right. *Id.* The Equal Protection Clause prohibits enforcement actions and prosecutions "deliberately based upon an unjustifiable standard," including "the exercise of protected statutory and constitutional rights." *Wayte v. United States*, 470 U.S. 598, 608 (1985) (quotation

omitted). To succeed on a Fifth Amendment claim, the defendant must identify "clear evidence" that the action had (1) "a discriminatory effect" (*i.e.*, that the government afforded "different treatment" to "similarly situated" individuals), and (2) "a discriminatory purpose" (*i.e.*, that the action was taken "because of" the impermissible consideration). *Washington*, 869 F.3d at 214. Courts dismiss prosecutions based on "statutorily protected" rights. *United States v. Haggerty*, 528 F. Supp. 1286, 1292-93 (D. Colo. 1981).

Courts find prosecutions unconstitutional when a defendant "is similarly situated to a person against whom the law was not enforced," except for the defendant's constitutionally protected status or activity. *Frederick Douglass Found., Inc.*, 82 F.4th at 1137. The government's decision to not charge either of the alleged co-conspirators is just such a decision.

Establishing discriminatory effect first requires a showing that the defendant was "similarly situated to a person against whom the law was not enforced." *Frederick Douglass*, 82 F.4th at 1137. Being "similarly situated" for constitutional purposes does not mean that the defendants allegedly did exactly the same thing. Rather, the phrase requires a showing that the "circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." *Id.*; *see United States v. Olvis*, 97 F.3d 739, 744 (4th Cir. 1996) (same).

Applying these factors here, Mr. Castelluzzo, along with alleged Conspirators 1 and 2, are accused of doing the same thing – conspiring with each other to launder money. There is no discernable reason that the government would prosecute Mr. Castelluzzo but not the other two alleged co-conspirators. The issue is whether the U.S. Attorney's differential treatment has "turned on" a constitutionally impermissible consideration—namely, Mr. Castelluzzo's assertion of his constitutional right to challenge the civil forfeiture and reject the government's settlement

offer. *Frederick Douglass*, 82 F.4th at 1147; *United States v. Torquato*, 602 F 2d 564 , 569 n.9 (3d Cir. 1979). There is clear evidence that those considerations are at the heart of the government's decisions. In certain circumstances, of course, it is difficult to parse the reasons that prosecutors either file or decline a case. Individual prosecutions can involve a variety of factors, such as the strength of the evidence, safety of witnesses, and prosecutorial resources.

The different treatment of Mr. Castelluzzo, however, could not be more stark, and the basis not more obvious: it is his choice to continue to pursue his civil forfeiture claim. The pursuit of charges against Mr. Castelluzzo also is "probative of discriminatory intent," which makes the decision a Fifth Amendment violation. *United States v. Mumphrey*, 193 F. Supp. 3d 1040, 1063 (N.D. Cal. 2016). Here the disparity is overwhelming. *Frederick Douglass*, 82 F.4th at 1140. And the law is equally stark in its prohibition of such an approach. The government in executing the criminal laws has "no interest, compelling or otherwise, to justify favoring" Conspirator-1 and Conspiractor-2 over Mr. Castelluzzo. *Id.* at 1143.  That requires dismissal of this case as a violation of the First Amendment.

Finally, in evaluating a selective prosecution claim, the "government's failure to follow its normal prosecutorial procedures mandates stricter judicial scrutiny of the prosecution." *Haggerty*, 528 F. Supp. at 1293; *see also, e.g.*, *United States v. Ojala*, 544 F.2d 940, 943 & n.2 (8th Cir. 1976). Here, the "government's prosecutorial measures . . . can only be characterized as abnormal." *Haggerty*, 528 F. Supp. at 1293.  The defense has been unable to find any other reported case that is comparable in this regard. This reinforces that there is no legitimate basis for this prosecution. As such, the indictment must be dismissed.

IV.    **Conclusion**

Mr. Castelluzzo requests that this Court dismiss the indictment. Alternatively, Mr.

Castelluzzo requests an evidentiary hearing to develop the factual record, especially concerning

why the government's second request for extension was never filed, the proposed order was

never signed, it made false and misleading statements in two jurisdictions, and delayed the case

to obtain the third extension.

Dated: Newark, New York
           January 5, 2026

Respectfully submitted,

*/ s / Peter Katz*

Law Offices of Peter Katz, LLC
Peter Katz, Esq.
116 Village Blvd., 2nd Floor
Princeton, NJ 08540
peter@pkatzlegal.com


/s/ *Leslie Sammis*

Leslie M. Sammis
Sammis Law Firm
1005 N. Marion Street
Tampa, FL 33602
lsammis@sammislawfirm.com

*Attorneys for Defendant Christopher Castelluzzo*